(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EGBERT *v.* BOULE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–147. Argued March 2, 2022—Decided June 8, 2022

Respondent Robert Boule owns a bed-and-breakfast—the Smuggler's Inn—in Blaine, Washington. The inn abuts the international border between Canada and the United States. Boule at times helped federal agents identify and apprehend persons engaged in unlawful cross-border activity on or near his property. But Boule also would provide transportation and lodging to illegal border crossers. Often, Boule would agree to help illegal border crossers enter or exit the United States, only to later call federal agents to report the unlawful activity.

In 2014, Boule informed petitioner Erik Egbert, a U. S. Border Patrol agent, that a Turkish national, arriving in Seattle by way of New York, had scheduled transportation to Smuggler's Inn. When Agent Egbert observed one of Boule's vehicles returning to the inn, he suspected that the Turkish national was a passenger and followed the vehicle to the inn. On Boule's account, Boule asked Egbert to leave, but Egbert refused, became violent, and threw Boule first against the vehicle and then to the ground. Egbert then checked the immigration paperwork for Boule's guest and left after finding everything in order. The Turkish guest unlawfully entered Canada later that evening.

Boule filed a grievance with Agent Egbert's supervisors and an administrative claim with Border Patrol pursuant to the Federal Tort Claims Act (FTCA). Egbert allegedly retaliated against Boule by reporting Boule's "SMUGLER" license plate to the Washington Department of Licensing for referencing illegal activity, and by contacting the Internal Revenue Service and prompting an audit of Boule's tax returns. Boule's FTCA claim was ultimately denied, and Border Patrol took no action against Egbert for his use of force or alleged acts of retaliation. Boule then sued Egbert in Federal District Court, alleging a Fourth Amendment violation for excessive use of force and a First

Amendment violation for unlawful retaliation. Invoking *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, Boule asked the District Court to recognize a damages action for each alleged constitutional violation. The District Court declined to extend *Bivens* as requested, but the Court of Appeals reversed.

*Held*: *Bivens* does not extend to create causes of action for Boule's Fourth Amendment excessive-force claim and First Amendment retaliation claim. Pp. 5–17.

  (a) In *Bivens*, the Court held that it had authority to create a damages action against federal agents for violating the plaintiff's Fourth Amendment rights. Over the next decade, the Court also fashioned new causes of action under the Fifth Amendment, see *Davis* v. *Passman,* 442 U. S. 228, and the Eighth Amendment, see *Carlson* v. *Green,* 446 U. S. 14. Since then, however, the Court has come "to appreciate more fully the tension between" judicially created causes of action and "the Constitution's separation of legislative and judicial power," *Hernández* v. *Mesa*, 589 U. S. \_\_\_, \_\_\_, and has declined 11 times to imply a similar cause of action for other alleged constitutional violations, see, *e.g., Chappell* v. *Wallace,* 462 U. S. 296; *Bush* v. *Lucas,* 462 U. S. 367. Rather than dispense with *Bivens*, the Court now emphasizes that recognizing a *Bivens* cause of action is "a disfavored judicial activity." *Ziglar* v. *Abbasi*, 582 U. S. \_\_\_, \_\_\_.

  The analysis of a proposed *Bivens* claim proceeds in two steps: A court asks first whether the case presents "a new *Bivens* context"—*i.e.,* is it "meaningfully different from the three cases in which the Court has implied a damages action," *Ziglar*, 582 U. S., at \_\_\_, and, second, even if so, do "special factors" indicate that the Judiciary is at least arguably less equipped than Congress to "weigh the costs and benefits of allowing a damages action to proceed." *Id.,* at \_\_\_. This two-step inquiry often resolves to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy. Further, under the Court's precedents, a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, "an alternative remedial structure." *Ziglar*, 582 U. S., at \_\_\_. Pp. 5–8.

  (b) The Court of Appeals conceded that Boule's Fourth Amendment claim presented a new *Bivens* context, but its conclusion that there was no reason to hesitate before recognizing a cause of action against Agent Egbert was incorrect for two independent reasons. Pp. 9–13.

    (1) First, the "risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Hernández*, 589 U. S., at \_\_\_. In *Hernández*, the Court declined to create a damages remedy for an excessive-force claim against a Border Patrol agent because "regulating the conduct of agents at the border unquestionably

has national security implications." *Id.*, at ___. That reasoning applies with full force here. The Court of Appeals disagreed because it viewed Boule's Fourth Amendment claim as akin to a "conventional" excessive-force claim, as in *Bivens*, and less like the cross-border shooting in *Hernández*. But that does not bear on the relevant point: Permitting suit against a Border Patrol agent presents national security concerns that foreclose *Bivens* relief. Further, the Court of Appeals' analysis betrays the pitfalls of applying the special-factors analysis at too granular a level. A court should not inquire whether *Bivens* relief is appropriate in light of the balance of circumstances in the "particular case." *United States* v. *Stanley,* 483 U. S. 669, 683. Rather, it should ask "[m]ore broadly" whether there is any reason to think that "judicial intrusion" into a given field might be "harmful" or "inappropriate," *id.,* at 681. The proper inquiry here is whether a court is competent to authorize a damages action not just against Agent Egbert, but against Border Patrol agents generally. The answer is no. Pp. 9–12.

(2) Second, Congress has provided alternative remedies for aggrieved parties in Boule's position that independently foreclose a *Bivens* action here. By regulation, Border Patrol must investigate "[a]lleged violations" and accept grievances from "[a]ny persons." 8 CFR §§287.10(a)–(b). Boule claims that this regulatory grievance procedure was inadequate, but this Court has never held that a *Bivens* alternative must afford rights such as judicial review of an adverse determination. *Bivens* "is concerned solely with deterring the unconstitutional acts of individual officers." *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 71. And, regardless, the question whether a given remedy is adequate is a legislative determination. As in *Hernández*, this Court has no warrant to doubt that the consideration of Boule's grievance secured adequate deterrence and afforded Boule an alternative remedy. See 589 U. S., at ___. Pp. 12–13.

(c) There is no *Bivens* cause of action for Boule's First Amendment retaliation claim. That claim presents a new *Bivens* context, and there are many reasons to think that Congress is better suited to authorize a damages remedy. Extending *Bivens* to alleged First Amendment violations would pose an acute "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson* v. *Creighton,* 483 U. S. 635, 638. In light of these costs, "Congress is in a better position to decide whether or not the public interest would be served" by imposing a damages action. *Bush*, 462 U. S., at 389. The Court of Appeals' reasons for extending *Bivens* in this context—that retaliation claims are "well-established" and that Boule alleges that Agent Egbert "was not carrying out official duties" when the retaliation occurred—lack merit. Also lacking

merit is Boule's claim that this Court identified a *Bivens* cause of action under allegedly similar circumstances in *Passman*. Even assuming factual parallels, *Passman* carries little weight because it predates the Court's current approach to implied causes of action. A plaintiff cannot justify a *Bivens* extension based on "parallel circumstances" with *Bivens, Passman,* or *Carlson*—the three cases in which the Court has implied a damages action—unless the plaintiff also satisfies the prevailing "analytic framework" prescribed by the last four decades of intervening case law. *Ziglar*, 582 U. S., at ___–___. Pp. 13–16.

998 F. 3d 370, reversed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed an opinion concurring in the judgment. SOTOMAYOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which BREYER and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

—————

No. 21–147

—————

## ERIK EGBERT, PETITIONER *v.* ROBERT BOULE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 8, 2022]

JUSTICE THOMAS delivered the opinion of the Court.

In *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), this Court authorized a damages action against federal officials for alleged violations of the Fourth Amendment. Over the past 42 years, however, we have declined 11 times to imply a similar cause of action for other alleged constitutional violations. See *Chappell* v. *Wallace*, 462 U. S. 296 (1983); *Bush* v. *Lucas*, 462 U. S. 367 (1983); *United States* v. *Stanley*, 483 U. S. 669 (1987); *Schweiker* v. *Chilicky*, 487 U. S. 412 (1988); *FDIC* v. *Meyer*, 510 U. S. 471 (1994); *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61 (2001); *Wilkie* v. *Robbins*, 551 U. S. 537 (2007); *Hui* v. *Castaneda*, 559 U. S. 799 (2010); *Minneci* v. *Pollard*, 565 U. S. 118 (2012); *Ziglar* v. *Abbasi*, 582 U. S. ___ (2017); *Hernández* v. *Mesa*, 589 U. S. ___ (2020). Nevertheless, the Court of Appeals permitted not one, but two constitutional damages actions to proceed against a U. S. Border Patrol agent: a Fourth Amendment excessive-force claim and a First Amendment retaliation claim. Because our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts, we reverse.

# I

Blaine, Washington, is the last town in the United States along U. S. Interstate Highway 5 before reaching the Canadian border.  Respondent Robert Boule is a longtime Blaine resident.  The rear of his property abuts the Canadian border at "0 Avenue," a Canadian street.  Boule's property line actually extends five feet into Canada.  Several years ago, Boule placed a line of small stones on his property to mark the international boundary.  As shown below, any person could easily enter the United States or Canada through or near Boule's property.  See App. 100.



Boule markets his home as a bed-and-breakfast aptly named "Smuggler's Inn."  The area surrounding the Inn "is a hotspot for cross-border smuggling of people, drugs, illicit money, and items of significance to criminal organizations." *Id.*, at 91.  "On numerous occasions," U. S. Border Patrol agents "have observed persons come south across the border and walk into Smuggler's Inn through the back door." *Id.*, at 101.  Federal agents also have seized from the Inn shipments of cocaine, methamphetamine, ecstasy, and other narcotics.  For a time, Boule served as a confidential

informant who would help federal agents identify and apprehend persons engaged in unlawful cross-border activity on or near his property. Boule claims that the Government has paid him upwards of $60,000 for his services.

Ever the entrepreneur, Boule saw his relationship with Border Patrol as a business opportunity. Boule would host persons who unlawfully entered the United States as "guests" at the Inn and offer to drive them to Seattle or elsewhere. He also would pick up Canada-bound guests throughout the State and drive them north to his property along the border. Either way, Boule would charge $100–$150 per hour for his shuttle service and require guests to pay for a night of lodging even if they never intended to stay at the Inn. Meanwhile, Boule would inform federal law enforcement if he was scheduled to lodge or transport persons of interest. In short order, Border Patrol agents would arrive to arrest the guests, often within a few blocks of the Inn. Boule would decline to offer his erstwhile customers a refund. In his view, this practice was "nothing any different than [the] normal policies of any hotel/motel." *Id.*, at 120.[1]

In light of Boule's business model, local Border Patrol agents, including petitioner Erik Egbert, were well acquainted with Smuggler's Inn and the criminal activity that attended it. On March 20, 2014, Boule informed Agent Egbert that a Turkish national, arriving in Seattle by way of New York, had scheduled transportation to Smuggler's Inn later that day. Agent Egbert grew suspicious, as he could think of "no legitimate reason a person would travel from Turkey to stay at a rundown bed-and-breakfast on the border in Blaine." *Id.*, at 104. The photograph below displays the amenities for which Boule's Turkish guest would have

―――――――
[1] Notwithstanding his defense of the Inn's policies, Boule was recently convicted in Canadian court for engaging in human trafficking. In December 2021, he pleaded guilty to trafficking 11 Afghanis and Syrians into Canada. He billed each foreign national between $200 and $700 for the trip. See *Regina* v. *Boule*, 2021 BCSC 2561, ¶¶7–11.

traveled more than 7,500 miles. See *id.*, at 102.



Later that afternoon, Agent Egbert observed one of Boule's vehicles—a black SUV with the license plate "SMUGLER"—returning to the Inn. Agent Egbert suspected that Boule's Turkish guest was a passenger and followed the SUV into the driveway so he could check the guest's immigration status. On Boule's account, the situation escalated from there. Boule instructed Agent Egbert to leave his property, but Agent Egbert declined. Instead, Boule claims, Agent Egbert lifted him off the ground and threw him against the SUV. After Boule collected himself, Agent Egbert allegedly threw him to the ground. Agent Egbert then checked the guest's immigration paperwork, concluded that everything was in order, and left. Later that evening, Boule's Turkish guest unlawfully entered Canada from Smuggler's Inn.

Boule lodged a grievance with Agent Egbert's supervisors, alleging that Agent Egbert had used excessive force and caused him physical injury. Boule also filed an administrative claim with Border Patrol pursuant to the Federal Tort Claims Act (FTCA). See 28 U. S. C. §2675(a). According to Boule, Agent Egbert retaliated against him while

those claims were pending by reporting Boule's "SMUGLER" license plate to the Washington Department of Licensing for referencing illegal conduct, and by contacting the Internal Revenue Service and prompting an audit of Boule's tax returns. Ultimately, Boule's FTCA claim was denied and, after a year-long investigation, Border Patrol took no action against Agent Egbert for his alleged use of force or acts of retaliation. Thereafter, Agent Egbert continued to serve as an active-duty Border Patrol agent.

In January 2017, Boule sued Agent Egbert in his individual capacity in Federal District Court, alleging a Fourth Amendment violation for excessive use of force and a First Amendment violation for unlawful retaliation. Boule invoked *Bivens* and asked the District Court to recognize a damages action for each alleged constitutional violation. The District Court declined to extend a *Bivens* remedy to Boule's claims and entered judgment for Agent Egbert. The Court of Appeals reversed. See 998 F. 3d 370, 385 (CA9 2021). Twelve judges dissented from the denial of rehearing en banc. See *id.*, at 373 (Bumatay, J., dissenting); *id.*, at 384 (Owens, J., dissenting); *ibid.* (Bress, J., dissenting).

We granted certiorari. 595 U. S. \_\_\_ (2021).

## II

In *Bivens*, the Court held that it had authority to create "a cause of action under the Fourth Amendment" against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations. 403 U. S., at 397. Although "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages," *id.*, at 396, the Court "held that it could authorize a remedy under general principles of federal jurisdiction," *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 7) (citing *Bivens*, 403 U. S., at 392). Over the following decade, the Court twice again fashioned new causes of action under the Constitution—first, for a former congressional staffer's

Fifth Amendment sex-discrimination claim, see *Davis* v. *Passman*, 442 U. S. 228 (1979); and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, see *Carlson* v. *Green*, 446 U. S. 14 (1980).

Since these cases, the Court has not implied additional causes of action under the Constitution. Now long past "the heady days in which this Court assumed common-law powers to create causes of action," *Malesko*, 534 U. S., at 75 (Scalia, J., concurring), we have come "to appreciate more fully the tension between" judicially created causes of action and "the Constitution's separation of legislative and judicial power," *Hernández*, 589 U. S., at ___ (slip op., at 5). At bottom, creating a cause of action is a legislative endeavor. Courts engaged in that unenviable task must evaluate a "range of policy considerations . . . at least as broad as the range . . . a legislature would consider." *Bivens*, 403 U. S., at 407 (Harlan, J., concurring in judgment); see also *post*, at 2 (GORSUCH, J., concurring in judgment). Those factors include "economic and governmental concerns," "administrative costs," and the "impact on governmental operations systemwide." *Ziglar*, 582 U. S., at ___, ___ (slip op., at 10, 13). Unsurprisingly, Congress is "far more competent than the Judiciary" to weigh such policy considerations. *Schweiker*, 487 U. S., at 423. And the Judiciary's authority to do so at all is, at best, uncertain. See, *e.g.*, *Hernández*, 589 U. S., at ___ (slip op., at 6).

Nonetheless, rather than dispense with *Bivens* altogether, we have emphasized that recognizing a cause of action under *Bivens* is "a disfavored judicial activity." *Ziglar*, 582 U. S., at ___ (slip op., at 11) (internal quotation marks omitted); *Hernández*, 589 U. S., at ___ (slip op., at 7) (internal quotation marks omitted). When asked to imply a *Bivens* action, "our watchword is caution." *Id.*, at ___ (slip op., at 6). "[I]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy[,] the courts must refrain from creating [it]." *Ziglar*,

582 U. S., at \_\_\_ (slip op., at 13). "[E]ven a single sound reason to defer to Congress" is enough to require a court to refrain from creating such a remedy. *Nestlé USA, Inc.* v. *Doe*, 593 U. S. \_\_\_, \_\_\_ (2021) (plurality opinion) (slip op., at 6). Put another way, "the most important question is who should decide whether to provide for a damages remedy, Congress or the courts?" *Hernández*, 589 U. S., at \_\_\_–\_\_\_ (slip op., at 19–20) (internal quotation marks omitted). If there is a rational reason to think that the answer is "Congress"—as it will be in most every case, see *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 12)—no *Bivens* action may lie. Our cases instruct that, absent utmost deference to Congress' preeminent authority in this area, the courts "arrogat[e] legislative power." *Hernández*, 589 U. S., at \_\_\_ (slip op., at 5).

To inform a court's analysis of a proposed *Bivens* claim, our cases have framed the inquiry as proceeding in two steps. See *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7). First, we ask whether the case presents "a new *Bivens* context"—*i.e.*, is it "meaningful[ly]" different from the three cases in which the Court has implied a damages action. *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 16). Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are "special factors" indicating that the Judiciary is at least arguably less equipped than Congress to "weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 12) (internal quotation marks omitted). If there is even a single "reason to pause before applying *Bivens* in a new context," a court may not recognize a *Bivens* remedy. *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7).

While our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy. For example, we have explained that a new context arises when there are "potential special factors

that previous *Bivens* cases did not consider." *Ziglar*, 582 U. S., at ___ (slip op., at 16). And we have identified several examples of new contexts—*e.g.*, a case that involves a "new category of defendants," *Malesko*, 534 U. S., at 68; see also *Ziglar*, 582 U. S., at ___ (slip op., at 11)—largely because they represent situations in which a court is not undoubtedly better positioned than Congress to create a damages action. We have never offered an "exhaustive" accounting of such scenarios, however, because no court could forecast every factor that might "counse[l] hesitation." *Id.*, at ___ (slip op., at 16). Even in a particular case, a court likely cannot predict the "systemwide" consequences of recognizing a cause of action under *Bivens*. *Ziglar*, 582 U. S., at ___ (slip op., at 13). That uncertainty alone is a special factor that forecloses relief. See *Hernández* v. *Mesa*, 885 F. 3d 811, 818 (CA5 2018) (en banc) ("The newness of this 'new context' should alone require dismissal").

Finally, our cases hold that a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, "an alternative remedial structure." *Ziglar*, 582 U. S., at ___ (slip op., at 14); see also *Schweicker*, 487 U. S., at 425. If there are alternative remedial structures in place, "that alone," like any special factor, is reason enough to "limit the power of the Judiciary to infer a new *Bivens* cause of action." *Ziglar*, 582 U. S., at ___ (slip op., at 14).[2] Importantly, the relevant question is not whether a *Bivens* action would "disrup[t]" a remedial scheme, *Schweicker*, 487 U. S., at 426, or whether the court "should provide for a wrong that would otherwise go unredressed," *Bush*, 462 U. S., at 388. Nor does it matter that

_____

[2] Congress also may preclude a claim under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), against federal officers if it affirmatively forecloses one. "Even in circumstances in which a *Bivens* remedy is generally available, an action under *Bivens* will be defeated if the defendant is immune from suit," *Hui* v. *Castaneda*, 559 U. S. 799, 807 (2010), and Congress may grant such immunity as it sees fit.

"existing remedies do not provide complete relief." *Ibid.*
Rather, the court must ask only whether it, rather than the
political branches, is better equipped to decide whether ex-
isting remedies "should be augmented by the creation of a
new judicial remedy." *Ibid*; see also *id.*, at 380 ("the ques-
tion [is] who should decide").

## III

Applying the foregoing principles, the Court of Appeals
plainly erred when it created causes of action for Boule's
Fourth Amendment excessive-force claim and First Amend-
ment retaliation claim.

## A

The Court of Appeals conceded that Boule's Fourth
Amendment claim presented a new context for *Bivens* pur-
poses, yet it concluded there was no reason to hesitate be-
fore recognizing a cause of action against Agent Egbert. See
998 F. 3d, at 387. That conclusion was incorrect for two in-
dependent reasons: Congress is better positioned to create
remedies in the border-security context, and the Govern-
ment already has provided alternative remedies that pro-
tect plaintiffs like Boule. We address each in turn.

### 1

In *Hernández*, we declined to create a damages remedy
for an excessive-force claim against a Border Patrol agent
who shot and killed a 15-year-old Mexican national across
the border in Mexico. See 589 U. S., at \_\_\_–\_\_\_ (slip op., at
1–2). We did not recognize a *Bivens* action there because
"regulating the conduct of agents at the border unquestion-
ably has national security implications," and the "risk of
undermining border security provides reason to hesitate be-
fore extending *Bivens* into this field." *Hernández*, 589 U. S.,
at \_\_\_ (slip op., at 14). This reasoning applies here with full
force. During the alleged altercation with Boule, Agent Eg-

bert was carrying out Border Patrol's mandate to "inter-
dic[t] persons attempting to illegally enter or exit the
United States or goods being illegally imported into or ex-
ported from the United States."  6 U. S. C. §211(e)(3)(A).
Because "[m]atters intimately related to foreign policy and
national security are rarely proper subjects for judicial in-
tervention," *Haig* v. *Agee*, 453 U. S. 280, 292 (1981), we re-
affirm that a *Bivens* cause of action may not lie where, as
here, national security is at issue.

The Court of Appeals thought otherwise.  In its view,
Boule's Fourth Amendment claim is "conventional," 998
F. 3d, at 387; see also *post,* at 8, 12 (SOTOMAYOR, J., concur-
ring in judgment in part and dissenting in part) (same),
and, though it arises in a new context, this Court has not
"'cast doubt'" on extending *Bivens* within the "'common and
recurrent sphere of law enforcement'" in which it arose, 998
F. 3d, at 389 (quoting *Ziglar*, 582 U. S., at ___ (slip op., at
11)).  While *Bivens* and this case do involve similar allega-
tions of excessive force and thus arguably present "almost
parallel circumstances" or a similar "mechanism of injury,"
*Ziglar*, 582 U. S., at ___ (slip op., at 15), these superficial
similarities are not enough to support the judicial creation
of a cause of action.  The special-factors inquiry—which
*Bivens* never meaningfully undertook, see *Stanley*, 483
U. S., at 678—shows here, no less than in *Hernández*, that
the Judiciary is not undoubtedly better positioned than
Congress to authorize a damages action in this national-se-
curity context.  That this case does not involve a cross-bor-
der shooting, as in *Hernández*, but rather a more "conven-
tional" excessive-force claim, as in *Bivens*, does not bear on
the relevant point.  Either way, the Judiciary is compara-
tively ill suited to decide whether a damages remedy
against any Border Patrol agent is appropriate.

The Court of Appeals downplayed the national-security
risk from imposing *Bivens* liability because Agent Egbert
was not "literally 'at the border,'" and Boule's guest already

had cleared customs in New York. 998 F. 3d, at 388; see also *post*, at 11–12, 18 (opinion of SOTOMAYOR, J.) (same). The court also found that Boule had a weightier interest in *Bivens* relief than the parents of the deceased Mexican teenager in *Hernández*, because Boule "is a United States citizen, complaining of harm suffered on his own property in the United States." 998 F. 3d, at 388; see also *post*, at 12, 18 (opinion of SOTOMAYOR, J.) (same). Finding that "any costs imposed by allowing a *Bivens* claim to proceed are out-weighed by compelling interests in favor of protecting United States citizens on their own property in the United States," the court extended *Bivens* to Boule's case. 998 F. 3d, at 389.

This analysis is deeply flawed. The *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action. A court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to "weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 12). Thus, a court should not inquire, as the Court of Appeals did here, whether *Bivens* relief is appropriate in light of the balance of circumstances in the "particular case." *Stanley*, 483 U. S., at 683. A court inevitably will "impai[r]" governmental interests, and thereby frustrate Congress' policymaking role, if it applies the "'special factors' analysis" at such a narrow "leve[l] of generality." *Id.*, at 681. Rather, under the proper approach, a court must ask "[m]ore broadly" if there is any reason to think that "judicial intrusion" into a given field might be "harmful" or "inappropriate." *Ibid.* If so, or even if there is the "*potential*" for such consequences, a court cannot afford a plaintiff a *Bivens* remedy. *Ziglar*, 582 U. S., at \_\_\_, \_\_\_ (slip op., at 16, 25) (emphasis added). As in *Hernández*, then, we ask here whether a court is competent to authorize a damages action not just against Agent

Egbert but against Border Patrol agents generally. The answer, plainly, is no. See *Hernández*, 589 U. S., at ___ (slip op., at 14) (refusing to extend *Bivens* into the "field" of "border security").

The Court of Appeals' analysis betrays the pitfalls of applying the special-factors analysis at too granular a level. The court rested on three irrelevant distinctions from *Hernández*. First, Agent Egbert was several feet from (rather than straddling) the border, but cross-border security is obviously implicated in either event. Second, Boule's guest arrived in Seattle from New York rather than abroad, but an alien's port of entry does not make him less likely to be a national-security threat. And third, Agent Egbert investigated immigration violations on our side of the border, not Canada's, but immigration investigations in *this* country are perhaps *more* likely to impact the national security of the United States. In short, the Court of Appeals offered no plausible basis to permit a Fourth Amendment *Bivens* claim against Agent Egbert to proceed.

2

Second, Congress has provided alternative remedies for aggrieved parties in Boule's position that independently foreclose a *Bivens* action here. In *Hernández*, we declined to authorize a *Bivens* remedy, in part, because the Executive Branch already had investigated alleged misconduct by the defendant Border Patrol agent. See 589 U. S., at ___–___, ___ (slip op., at 9–10, 14). In *Malesko*, we explained that *Bivens* relief was unavailable because federal prisoners could, among other options, file grievances through an "Administrative Remedy Program." 534 U. S., at 74. Both kinds of remedies are available here. The U. S. Border Patrol is statutorily obligated to "control, direc[t], and supervis[e] . . . all employees." 8 U. S. C. §1103(a)(2). And, by regulation, Border Patrol must investigate "[a]lleged violations of the standards for enforcement activities" and accept

grievances from "[a]ny persons wishing to lodge a complaint." 8 CFR §§287.10(a)–(b). As noted, Boule took advantage of this grievance procedure, prompting a year-long internal investigation into Agent Egbert's conduct. See *supra*, at 4–5.

Boule nonetheless contends that Border Patrol's grievance process is inadequate because he is not entitled to participate and has no right to judicial review of an adverse determination.[3] But we have never held that a *Bivens* alternative must afford rights to participation or appeal. That is so because *Bivens* "is concerned solely with deterring the unconstitutional acts of individual officers"—*i.e.*, the focus is whether the Government has put in place safeguards to "preven[t]" constitutional violations "from recurring." *Malesko*, 534 U. S., at 71, 74; see also *Meyer*, 510 U. S., at 485. And, again, the question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts. So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy. That is true even if a court independently concludes that the Government's procedures are "not as effective as an individual damages remedy." *Bush*,

———————

[3] Boule also argues that Agent Egbert forfeited any argument about Border Patrol's grievance process because he did not raise the issue in the Court of Appeals. We disagree. Because recognizing a *Bivens* cause of action "is an extraordinary act that places great stress on the separation of powers," *Nestlé USA, Inc.* v. *Doe*, 593 U. S. \_\_\_, \_\_\_ (2021) (plurality opinion) (slip op., at 7), we have "a concomitant responsibility" to evaluate any grounds that counsel against *Bivens* relief, *Oliva* v. *Nivar*, 973 F. 3d 438, 443, n. 2 (CA5 2020); see also *Elhady* v. *Unidentified CBP Agents*, 18 F. 4th 880, 884 (CA6 2021). And, in any event, Agent Egbert has consistently claimed that alternative remedies foreclose applying *Bivens* in this case. Thus, under our precedents, he is "not limited to the precise arguments [he] made below." *Yee* v. *Escondido*, 503 U. S. 519, 534 (1992).

462 U. S., at 372.  Thus here, as in *Hernández*, we have no warrant to doubt that the consideration of Boule's grievance against Agent Egbert secured adequate deterrence and afforded Boule an alternative remedy.  See 589 U. S., at ___ (slip op., at 10).

B

We also conclude that there is no *Bivens* cause of action for Boule's First Amendment retaliation claim.  While we have assumed that such a damages action might be available, see, *e.g.*, *Hartman* v. *Moore*, 547 U. S. 250, 252 (2006), "[w]e have never held that *Bivens* extends to First Amendment claims," *Reichle* v. *Howards*, 566 U. S. 658, 663, n. 4 (2012).  Because a new context arises when there is a new "constitutional right at issue," *Ziglar*, 582 U. S., at ___ (slip op., at 16), the Court of Appeals correctly held that Boule's First Amendment claim presents a new *Bivens* context.  See 998 F. 3d, at 390.  Now presented with the question whether to extend *Bivens* to this context, we hold that there is no *Bivens* action for First Amendment retaliation.  There are many reasons to think that Congress, not the courts, is better suited to authorize such a damages remedy.

Recognizing any new *Bivens* action "entail[s] substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  *Anderson* v. *Creighton*, 483 U. S. 635, 638 (1987).  Extending *Bivens* to alleged First Amendment violations would pose an acute risk of increasing such costs.  A plaintiff can turn practically any adverse action into grounds for a retaliation claim.  And, "[b]ecause an official's state of mind is easy to allege and hard to disprove, insubstantial claims that turn on [retaliatory] intent may be less amenable to summary disposition."  *Crawford-El* v. *Britton*, 523 U. S. 574, 584–585 (1998) (internal quotation marks omitted).  Even a frivolous

retaliation claim "threaten[s] to set off broad-ranging discovery in which there is often no clear end to the relevant evidence." *Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (slip op., at 11) (internal quotation marks omitted).

"[U]ndoubtedly," then, the "prospect of personal liability" under the First Amendment would lead "to new difficulties and expense." *Schweiker*, 487 U. S., at 425. Federal employees "face[d with] the added risk of personal liability for decisions that they believe to be a correct response to improper [activity] would be deterred from" carrying out their duties. *Bush*, 462 U. S., at 389. We are therefore "convinced" that, in light of these costs, "Congress is in a better position to decide whether or not the public interest would be served" by imposing a damages action. *Id.*, at 390.

The Court of Appeals nonetheless extended *Bivens* to the First Amendment because, in its view, retaliation claims are "well-established," and Boule alleges that Agent Egbert "was not carrying out official duties" when he retaliated against him. 998 F. 3d, at 391. Neither rationale has merit. First, just because plaintiffs often plead unlawful retaliation to establish a First Amendment violation is not a reason to afford them a cause of action to sue federal officers for money damages. If anything, that retaliation claims are common, and therefore more likely to impose "a significant expansion of Government liability," *Meyer*, 510 U. S., at 486, counsels against permitting *Bivens* relief.

Second, the Court of Appeals' scope-of-duty observation does not meaningfully limit the number of potential *Bivens* claims or otherwise undermine the reasons for hesitation stated above. It is easy to allege that federal employees acted beyond the scope of their authority when claiming a constitutional violation. And, regardless, granting *Bivens* relief because a federal agent supposedly did not act pursuant to his law-enforcement mission "misses the point." *Hernández*, 589 U. S., at ___ (slip op., at 14). "The question is not whether national security," or some other governmental

interest, actually "requires [the defendant's] conduct." *Ibid.* Instead, we "ask whether the Judiciary should alter the framework established by the political branches for addressing" any such conduct that allegedly violates the Constitution. *Ibid.* With respect to that question, the foregoing discussion shows that the Judiciary is ill equipped to alter that framework generally, and especially so when it comes to First Amendment claims.

Boule responds that any hesitation is unwarranted because this Court in *Passman* already identified a *Bivens* cause of action under allegedly similar circumstances. There, the Court permitted a congressional staffer to sue a congressman for sex discrimination under the Fifth Amendment. See 442 U. S., at 231. In Boule's view, *Passman*, like this case, permitted a damages action to proceed even though it required the factfinder to probe a federal official's motives for taking an adverse action against the plaintiff.

Even assuming the factual parallels are as close as Boule claims, *Passman* carries little weight because it predates our current approach to implied causes of action and diverges from the prevailing framework in three important ways. First, the *Passman* Court concluded that a *Bivens* action must be available if there is "no effective means other than the judiciary to vindicate" the purported Fifth Amendment right. 442 U. S., at 243; see also *Carlson*, 446 U. S., at 18–19 (Congress can foreclose *Bivens* relief by "provid[ing] an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective"). Since then, however, we have explained that the absence of relief "does not by any means necessarily imply that courts should award money damages." *Schweiker*, 487 U. S., at 421. Second, *Passman* indicated that a damages remedy is appropriate unless Congress "explicit[ly]" declares that a claimant "may not recover money damages." 442 U. S., at 246–247 (internal quotation marks omitted; emphasis deleted). Now,

though, we defer to "congressional inaction" if "the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms." *Schweiker*, 487 U. S., at 423; see also *Ziglar*, 582 U. S., at ___ (slip op., at 14). Third, when assessing the "special factors," *Passman* asked whether a court is competent to calculate damages "without difficult questions of valuation or causation." 442 U. S., at 245. But today, we do not ask whether a court can determine a damages amount. Rather, we ask whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" at all. *Ziglar*, 582 U. S., at ___ (slip op., at 13).

In short, as we explained in *Ziglar*, a plaintiff cannot justify a *Bivens* extension based on "parallel circumstances" with *Bivens*, *Passman*, or *Carlson* unless he also satisfies the "analytic framework" prescribed by the last four decades of intervening case law. 582 U. S., at ___–___ (slip op., at 15–16). Boule has failed to do so.

## IV

Since it was decided, *Bivens* has had no shortage of detractors. See, *e.g.*, *Bivens*, 403 U. S., at 411 (Burger, C. J., dissenting); *id.*, at 427 (Black, J., dissenting); *id.*, at 430 (Blackmun, J., dissenting); *Carlson*, 446 U. S., at 31 (Rehnquist, J., dissenting); *Malesko*, 534 U. S., at 75 (Scalia, J., concurring); *Hernández*, 589 U. S., at ___ (THOMAS, J., concurring) (slip op., at 1); *post*, at 1–3 (opinion of GORSUCH, J.). And, more recently, we have indicated that if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution. See *Ziglar*, 582 U. S., at ___ (slip op., at 11). But, to decide the case before us, we need not reconsider *Bivens* itself. Accordingly, we reverse the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–147

———————

## ERIK EGBERT, PETITIONER *v.* ROBERT BOULE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 8, 2022]

JUSTICE GORSUCH, concurring in the judgment.

Our Constitution's separation of powers prohibits federal courts from assuming legislative authority. As the Court today acknowledges, *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), crossed that line by "impl[ying]" a new set of private rights and liabilities Congress never ordained. *Ante*, at 5–6; see also *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001); *Nestlé USA, Inc.* v. *Doe*, 593 U. S. \_\_\_, \_\_\_–\_\_\_ (2021) (GORSUCH, J., concurring) (slip op., at 4–7).

Recognizing its misstep, this Court has struggled for decades to find its way back. Initially, the Court told lower courts to follow a "two ste[p]" inquiry before applying *Bivens* to any new situation. *Ante*, at 7. At the first step, a court had to ask whether the case before it presented a "new context" meaningfully different from *Bivens. Ante*, at 7. At the second, a court had to consider whether "'special factors'" counseled hesitation before recognizing a new cause of action. *Ibid.* But these tests soon produced their own set of questions: What distinguishes the first step from the second? What makes a context "new" or a factor "special"? And, most fundamentally, on what authority may courts recognize new causes of action even under these standards?

Today, the Court helpfully answers some of these lingering questions. It recognizes that our two-step inquiry really boils down to a "single question": Is there "any reason to

think Congress might be better equipped" than a court to
"'weigh the costs and benefits of allowing a damages action
to proceed'"?  *Ante*, at 7–8; see *Ziglar* v. *Abbasi*, 582 U. S.
120, ___–___ (2017) (slip op., at 13–14).  But, respectfully,
resolving that much only serves to highlight the larger re-
maining question:  When might a court *ever* be "better
equipped" than the people's elected representatives to
weigh the "costs and benefits" of creating a cause of action?

It seems to me that to ask the question is to answer it.  To
create a new cause of action is to assign new private rights
and liabilities—a power that is in every meaningful sense
an act of legislation.  See *Sandoval*, 532 U. S., at 286–287;
*Nestlé*, 593 U. S., at ___ (GORSUCH, J., concurring) (slip op.,
at 5); *Jesner* v. *Arab Bank, PLC*, 584 U. S. ___, ___ (2018)
(GORSUCH, J., concurring in part and concurring in judg-
ment) (slip op., at 3).  If exercising that sort of authority
may once have been a "'proper function for common-law
courts'" in England, it is no longer generally appropriate
"'for federal tribunals'" in a republic where the people elect
representatives to make the rules that govern them.  *Sand-
oval*, 532 U. S., at 287.  Weighing the costs and benefits of
new laws is the bread and butter of legislative committees.
It has no place in federal courts charged with deciding cases
and controversies under existing law.

Instead of saying as much explicitly, however, the Court
proceeds on to conduct a case-specific analysis.  And there I
confess difficulties.  The plaintiff is an American citizen
who argues that a federal law enforcement officer violated
the Fourth Amendment in searching the curtilage of his
home.  Candidly, I struggle to see how this set of facts dif-
fers meaningfully from those in *Bivens* itself.  To be sure, as
the Court emphasizes, the episode here took place near an
international border and the officer's search focused on vio-
lations of the immigration laws.  But why does that matter?
The Court suggests that Fourth Amendment violations

matter less in this context because of "likely" national-security risks. *Ante*, at 11–12. So once more, we tote up for ourselves the costs and benefits of a private right of action in this or that setting and reach a legislative judgment. To atone for *Bivens*, it seems we continue repeating its most basic mistake.

Of course, the Court's real messages run deeper than its case-specific analysis. If the costs and benefits do not justify a new *Bivens* action on facts so analogous to *Bivens* itself, it's hard to see how they ever could. And if the only question is whether a court is "better equipped" than Congress to weigh the value of a new cause of action, surely the right answer will always be no. Doubtless, these are the lessons the Court seeks to convey. I would only take the next step and acknowledge explicitly what the Court leaves barely implicit. Sometimes, it seems, "this Court leaves a door ajar and holds out the possibility that someone, someday might walk through it" even as it devises a rule that ensures "no one . . . ever will." *Edwards* v. *Vannoy*, 593 U. S. \_\_\_, \_\_\_ (2021) (GORSUCH, J., concurring) (slip op., at 1). In fairness to future litigants and our lower court colleagues, we should not hold out that kind of false hope, and in the process invite still more "protracted litigation destined to yield nothing." *Nestlé*, 593 U. S., at \_\_\_ (GORSUCH, J., concurring) (slip op., at 7). Instead, we should exercise "the truer modesty of ceding an ill-gotten gain," *ibid.*, and forthrightly return the power to create new causes of action to the people's representatives in Congress.

# SUPREME COURT OF THE UNITED STATES

—————

No. 21–147

—————

## ERIK EGBERT, PETITIONER *v.* ROBERT BOULE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 8, 2022]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and
JUSTICE KAGAN join, concurring in the judgment in part
and dissenting in part.

Respondent Robert Boule alleges that petitioner Erik Eg-
bert, a U. S. Customs and Border Patrol agent, violated the
Fourth Amendment by entering Boule's property without a
warrant and assaulting him. Existing precedent permits
Boule to seek compensation for his injuries in federal court.
See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S.
388 (1971); *Ziglar* v. *Abbasi*, 582 U. S. 120 (2017). The
Court goes to extraordinary lengths to avoid this result: It
rewrites a legal standard it established just five years ago,
stretches national-security concerns beyond recognition,
and discerns an alternative remedial structure where none
exists. The Court's innovations, taken together, enable it
to close the door to Boule's claim and, presumably, to others
that fall squarely within *Bivens*' ambit.

Today's decision does not overrule *Bivens*. It neverthe-
less contravenes precedent and will strip many more indi-
viduals who suffer injuries at the hands of other federal of-
ficers, and whose circumstances are materially
indistinguishable from those in *Bivens*, of an important
remedy. I therefore dissent from the Court's disposition of
Boule's Fourth Amendment claim. I concur in the Court's
judgment that Boule's First Amendment retaliation claim

may not proceed under *Bivens*, but for reasons grounded in precedent rather than this Court's newly announced test.

## I

This case comes to the Court following the District Court's grant of summary judgment to Agent Egbert. The Court is therefore bound to draw all reasonable factual inferences in favor of Boule. See *Tolan* v. *Cotton*, 572 U. S. 650, 656–657 (2014) (*per curiam*). Because the Court fails to do so, the factual record is described below in some detail, in the light our precedent requires.

## A

Boule is a U. S. citizen who owns, operates, and lives in a small bed-and-breakfast called the Smuggler's Inn in Blaine, Washington. The property line of the land on which the inn is located touches the U. S.-Canada border. Shortly after purchasing the property in 2000, Boule became aware that people used his property to cross the border illegally in both directions. Boule began serving as a paid, confidential informant for Customs and Border Protection (CBP) in 2003 and for Immigration and Customs Enforcement (ICE) in 2008. At the time of the events at issue in this case, Boule was still serving as an informant for ICE. ICE would coordinate with CBP and other agencies based on the information Boule provided. Over the years, Boule provided information leading to numerous arrests.

On the morning of March 20, 2014, petitioner Erik Egbert, a CBP agent, twice stopped Boule while Boule was running errands in town. Agent Egbert knew that Boule was a long-time informant for ICE and that he had previously worked as an informant for CBP. Agent Egbert asked Boule about guests at the inn, and Boule advised him of a guest he expected to arrive that day from New York who had flown in from Turkey the day before. Boule explained that two of his employees were en route to pick the guest up

at the Seattle-Tacoma International Airport. Agent Egbert continued patrolling in his CBP vehicle for the rest of the morning but stayed near the inn so he would see when the car carrying the guest returned. When it arrived, he followed the car into the driveway of the inn, passing a "no trespassing" sign. Agent Egbert parked his vehicle behind the arriving car in the driveway immediately adjacent to the inn.

Agent Egbert exited his patrol vehicle and approached the car. Boule's employee also exited the car; the guest remained inside. From the front porch of his inn, Boule asked Agent Egbert to leave. When Agent Egbert refused, Boule stepped off the porch, positioned himself between Agent Egbert and the vehicle, and explained that the person in the car was a guest who had come from New York to Seattle and who had been through security at the airport. Boule again asked Agent Egbert to leave. Agent Egbert grabbed Boule by his chest, lifted him up, and shoved him against the vehicle and then threw him to the ground. Boule landed on his hip and shoulder.

Agent Egbert opened the car door and asked the guest about his immigration status. Boule called 911 to request a supervisor; Agent Egbert relayed the same request over his radio. Several minutes later, a supervisor and another agent arrived at the inn. After concluding that the guest was lawfully in the country (just as Boule had previously informed Agent Egbert), the three officers departed. Boule later sought medical treatment for his injuries.

Boule complained to Agent Egbert's superiors about the incident and filed an administrative claim with CBP, which allegedly prompted Agent Egbert to retaliate against Boule. Agent Egbert contacted the Internal Revenue Service (IRS), the Social Security Administration, the Washington State Department of Licensing, and the Whatcom County Assessor's Office, asking them to investigate Boule's business. These agencies did so, but none found that Boule had done

anything wrong. Boule paid over $5,000 to his accountant to assist him in responding to the IRS' tax audit. Boule also filed claims pursuant to the Federal Tort Claims Act (FTCA), which were denied. CBP's investigation of Agent Egbert concluded that he failed to be forthcoming with investigators and "demonstrated lack of integrity," serious offenses that warranted his removal. Rev. Redacted App. 184.

## B

Boule sued Agent Egbert in Federal District Court, seeking damages under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, for violation of Boule's First and Fourth Amendment rights. The District Court granted summary judgment to Agent Egbert on both claims. The Court of Appeals reversed, concluding that both claims were cognizable under *Bivens*. In the Court of Appeals' view, Boule's Fourth Amendment claim constituted a modest extension of *Bivens*. Even so, the court explained, no special factors counseled hesitation such that this extension should be foreclosed; rather, "Boule's Fourth Amendment excessive force claim is part and parcel of the 'common and recurrent sphere of law enforcement'" that remained "a permissible area for *Bivens* claims." 998 F. 3d 370, 389 (CA9 2021) (quoting *Ziglar*, 582 U. S., at ___ (slip op., at 11)). The court separately held that Boule's First Amendment claim could proceed under *Bivens*.

This Court granted certiorari. 595 U. S. ___ (2021).

## II
## A

In *Bivens*, the plaintiff alleged that Federal Bureau of Narcotics agents unlawfully entered his apartment in New York City and used constitutionally unreasonable force to arrest him. 403 U. S., at 389. This Court observed that an "agent acting—albeit unconstitutionally—in the name of

the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." *Id.*, at 392. The Fourth Amendment, the Court explained, "guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority." *Ibid.*

The Court ultimately held that a "violation of [the Fourth Amendment] by a federal agent acting under color of his authority gives rise to a cause of action for damages." *Id.*, at 389. In doing so, the Court observed that existing state-law causes of action were no substitute for a federal cause of action because "[t]he interests protected by state laws regulating trespass and the invasion of privacy" and those protected by the Fourth Amendment "may be inconsistent or even hostile." *Id.*, at 394; see also *id.*, at 410 (Harlan, J., concurring in judgment) ("For people in Bivens' shoes, it is damages or nothing").[1] The Court also noted that the case before it "involve[d] no special factors counselling hesitation," such as a question concerning federal fiscal policy. *Id.*, at 396.

This Court has twice extended the cause of action first articulated in *Bivens*: first to a Fifth Amendment due process claim for sex discrimination, see *Davis* v. *Passman*, 442 U. S. 228 (1979), and then to an Eighth Amendment deliberate indifference claim for failure to provide proper medical attention, see *Carlson* v. *Green*, 446 U. S. 14 (1980). In *Davis*, *Carlson*, and subsequent cases, the Court built on

———————

[1] For example, an individual "may bar the door against an unwelcome private intruder, or call the police if he persists in seeking entrance" and may seek damages under state law "for any consequent trespass." *Bivens*, 403 U. S., at 394. By contrast, "[t]he mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist an unlawful entry or arrest by resort to the local police; and a claim of authority to enter is likely to unlock the door as well." *Ibid.*

*Bivens*' inquiry to develop a two-step test for determining whether a *Bivens* cause of action may be "defeated." *Carlson*, 446 U. S., at 18. First, the Court considered whether, under the circumstances of a particular case, special factors counseled hesitation in allowing a private right of action to proceed. See, *e.g.*, *Bivens*, 403 U. S., at 396; *Davis*, 442 U. S., at 246; *Carlson*, 446 U. S., at 18; *Bush* v. *Lucas*, 462 U. S. 367, 377–380 (1983). Second, the Court considered whether "Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson*, 446 U. S., at 18–19; see also, *e.g.*, *Davis*, 442 U. S., at 246–247; *Bush*, 462 U. S., at 377–378; *Wilkie* v. *Robbins*, 551 U. S. 537, 550 (2007) (describing this two-step test). Where, for example, Congress crafted an "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations," *Bush*, 462 U. S., at 388, this Court concluded that "it would be inappropriate . . . to supplement that regulatory scheme with a new judicial remedy," *id.*, at 368; accord, *Schweiker* v. *Chilicky*, 487 U. S. 412, 414 (1988). Applying this two-step test, the Court has declined to extend *Bivens* beyond situations like those addressed in *Davis*, *Carlson*, and *Bivens* itself. See *ante*, at 1.

In *Ziglar* v. *Abbasi*, 582 U. S. 120, the Court not only declined to extend *Bivens* but also revised and narrowed its two-step analytic framework. The *Ziglar* Court set forth a new inquiry requiring courts considering a *Bivens* claim first to ask whether a case "is different in a meaningful way from previous *Bivens* cases decided by this Court" and therefore arises in a "new . . . context." 582 U. S., at ___ (slip op., at 16); see also *Hernández* v. *Mesa*, 589 U. S. ___, ___ (2020) (slip op., at 7). The *Ziglar* Court offered a laundry list of differences that "might" be meaningful, including "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the

extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." 582 U. S., at \_\_\_ (slip op., at 16). The Court recognized, however, that some differences "will be so trivial that they will not suffice to create a new *Bivens* context." *Id.*, at \_\_\_ (slip op., at 26).

If the differences are in fact "meaningful ones," *ibid.*, "then the context is new," *id.*, at \_\_\_ (slip op., at 16), and a court "proceed[s] to the second step" of the analysis, *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7). The second step requires courts to consider whether special factors counsel hesitation in recognizing a *Bivens* remedy in a new context. *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 12); *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7).

Importantly, even as the *Ziglar* Court grafted a more demanding new-context inquiry onto the traditional *Bivens* framework, the Court emphasized that its opinion was "not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." 582 U. S., at \_\_\_ (slip op., at 11). Quite the opposite: The Court recognized that *Bivens* "vindicate[s] the Constitution by allowing some redress for injuries" and "provides instruction and guidance to federal law enforcement officers going forward." 582 U. S., at \_\_\_ (slip op., at 11). Accordingly, the Court explained, there are "powerful reasons to retain [*Bivens*]" in the "common and recurrent sphere of law enforcement." *Ibid.* The Court further recognized that "individual instances of discrimination or law enforcement overreach" are, by their nature, "difficult to address except by way of damages actions after the fact." *Id.*, at \_\_\_ (slip op., at 21).

## B

*Ziglar* and *Hernández* control here. Applying the two-step framework set forth in those cases, the Court of Appeals' determination that Boule's Fourth Amendment claim is cognizable under *Bivens* should be affirmed for two independent reasons. First, Boule's claim does not present a new context. Second, even if it did, no special factors would counsel hesitation.

## 1

Boule's Fourth Amendment claim does not arise in a new context. *Bivens* itself involved a U. S. citizen bringing a Fourth Amendment claim against individual, rank-and-file federal law enforcement officers who allegedly violated his constitutional rights within the United States by entering his property without a warrant and using excessive force. Those are precisely the facts of Boule's complaint.

The only arguably salient difference in "context" between this case and *Bivens* is that the defendants in *Bivens* were employed at the time by the (now-defunct) Federal Bureau of Narcotics, while Agent Egbert was employed by CBP. As discussed, however, this Court's precedent instructs that some differences are too "trivial . . . to create a new *Bivens* context." *Ziglar*, 582 U. S., at ___ (slip op., at 26).[2] That it was a CBP agent rather than a Federal Bureau of Narcotics agent who unlawfully entered Boule's property and used constitutionally excessive force against him plainly is not the sort of "meaningful" distinction that our new-context inquiry is designed to weed out. *Ibid.*

---

[2] Egbert argues in passing that the fact that he was operating under a "'statutory . . . mandate' not invoked in prior cases," standing alone, "dooms [Boule's] no-new-context argument." Reply Brief 19 (quoting *Ziglar*, 582 U. S., at ___ (slip op., at 16)). Not so. Egbert fails to show that any difference in statutory mandates as between CBP agents and other law enforcement officers is "meaningful," which our precedents require him to do. *Id.*, at ___ (slip op., at 16).

It is of course well established that a *Bivens* suit involving an entirely "'new category of defendants'" arises in a "'new context.'" *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 11); see also *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7). The Court, however, has never relied on this principle to draw artificial distinctions between line-level officers of the 83 different federal law enforcement agencies with authority to make arrests and provide police protection. See Dept. of Justice, C. Brooks, Federal Law Enforcement Officers, 2016—Statistical Tables (NCJ 251922, Oct. 2019), https://bjs.ojp.gov/content/pub/pdf/fleo16st.pdf. Indeed, if the "new context" inquiry were defined at such a fine level of granularity, every case would raise a new context, because the Federal Bureau of Narcotics no longer exists. See National Archives, Records of the Drug Enforcement Administration [DEA] (Aug. 15, 2016), https://www.archives.gov/research/guide-fed-records/groups/170.html.

Moreover, the "new category of defendants" language traces back to a different concern raised in the Court's decision in *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 68 (2001). That case involved an Eighth Amendment claim brought by a federal prisoner against a private corporation under contract with the federal Bureau of Prisons. The Court observed that "the threat of suit against an individual's employer," rather than "the individual directly responsible for the alleged injury," "was not the kind of deterrence contemplated by *Bivens*." *Id.*, at 70–71. Applying *Bivens* to a corporate defendant would amount to a "marked extension of *Bivens* . . . to contexts that would not advance *Bivens*' core purpose of deterring individual officers from engaging in unconstitutional wrongdoing." *Malesko*, 534 U. S., at 74; see also *FDIC* v. *Meyer*, 510 U. S. 471, 485 (1994) (declining to allow a *Bivens* claim to proceed against a federal agency for similar reasons). Here, by contrast, Boule's suit against Agent Egbert directly advances that core purpose.

At bottom, Boule's claim is materially indistinguishable from the claim brought in *Bivens*. His case therefore does not present a new context for the purposes of assessing whether a *Bivens* remedy is available.

### 2

Even assuming that this case presents a new context, no special factors warrant foreclosing a *Bivens* action.

The Court "has not defined the phrase 'special factors counselling hesitation,'" but it has recognized that the "inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 582 U. S., at ___ (slip op., at 12); see also *Hernández*, 589 U. S., at ___–___ (slip op., at 7–8). For example, where a claim "would call into question the formulation and implementation of a general policy" or "require courts to interfere in an intrusive way with sensitive functions of the Executive Branch," recognizing a *Bivens* action may be inappropriate. *Ziglar*, 582 U. S., at ___–___ (slip op., at 17–18); see also, *e.g.*, *Chappell* v. *Wallace*, 462 U. S. 296, 300 (1983) (declining to extend *Bivens* where military personnel sought damages from superior officers, citing concerns about "tamper[ing] with the established relationship between enlisted military personnel and their superior officers," which lies "at the heart of the necessarily unique structure of the Military Establishment"). Precedent thus establishes that "separation-of-powers principles . . . should be central to the [special-factors] analysis." *Ziglar*, 582 U. S., at ___ (slip op., at 12).

Here, the only possible special factor is that Boule's property abuts an international border. Boule's case, however, is a far cry from others in which the Court declined to extend *Bivens* for reasons of national security or foreign relations. In *Hernández*, for example, a CBP agent shot and killed a Mexican child across the U. S.-Mexico border. 589

U. S., at \_\_\_ (slip op., at 2). The Mexican Government unsuccessfully sought extradition of the agent to Mexico, and after an investigation, the U. S. Department of Justice declined to bring charges against the agent. *Ibid.* The parents of the deceased child attempted to bring a *Bivens* action against the CBP agent, but this Court held that several "warning flags" counseled caution, including a "potential effect on foreign relations." *Hernández*, 589 U. S., at \_\_\_ (slip op., at 9). The Court observed that "[a] cross-border shooting is by definition an international incident," and that both the United States and Mexico had "legitimate and important interests that may be affected by the way in which this matter is handled." *Id.*, at \_\_\_, \_\_\_ (slip op., at 9, 11). The Court concluded that because "regulating the conduct of agents at the border unquestionably has national security implications, the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Id.*, at \_\_\_ (slip op., at 14).

The conduct here took place near an international border and involved a CBP agent. That, however, is where the similarities with *Hernández* begin and end. The conduct occurred exclusively on U. S. soil, and the injury was to a U. S. citizen. This case therefore does not present an "international incident" that might affect diplomatic relations, unlike the cross-border killing of a foreign-national child. As for national-security concerns, the Court in *Hernández* emphasized that "some [CBP agents] are stationed right at the border and have the responsibility of attempting to prevent illegal entry"; it was "[f]or th[i]s reaso[n]," among others, that their conduct had "a clear and strong connection to national security." *Id.*, at \_\_\_ (slip op., at 13). Here, by contrast, Agent Egbert was not "attempting to prevent illegal entry" or otherwise engaged in activities with a "strong connection to national security." *Ibid.* Agent Egbert was aware (because Boule had told him earlier in the day and again at the scene) that the foreign national arriving at the

inn had already entered the United States by airplane and had been processed by U. S. customs at the airport in New York the previous day.

Nor does this case present special factors similar to those that deterred the Court from recognizing a *Bivens* action in *Ziglar*. In that case, foreign nationals who had been unlawfully present in the United States brought a *Bivens* action against three "high executive officers in the Department of Justice" and two wardens of the facility where they had been held. *Ziglar*, 582 U. S., at ___ (slip op., at 2). The Court reasoned that allowing the plaintiffs' claims to proceed against the executive officers "would call into question the formulation and implementation of a general policy," and that the discovery and litigation process would "border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question," thereby implicating sensitive national-security functions entrusted to Congress and the President. *Id.*, at ___–___ (slip op., at 17–18). If *Bivens* liability were imposed, the Court explained, "high officers who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis," and "the costs and difficulties of later litigation might intrude upon and interfere with the proper exercise of their office." *Ziglar*, 582 U. S., at ___ (slip op., at 22).

Here, Boule plainly does not seek to challenge or alter "high-level executive policy." *Id.*, at ___ (slip op., at 16). Allowing his claim to proceed would not require courts to intrude into "the discussion and deliberations that led to the formation" of any policy or national-security decision or interest. *Id.*, at ___ (slip op., at 18). Agent Egbert, a line officer, was engaged in a run-of-the-mill inquiry into the status of a foreign national on U. S. soil who had no actual or suggested ties to terrorism, and who recently had been through U. S. customs to boot. See *id.*, at ___ (slip op., at 21) (distinguishing a challenge to "individual instances of

discrimination or law enforcement overreach," which lends itself to a *Bivens* action, from a challenge to "large-scale policy decisions," which does not). No special factors counsel against allowing Boule's *Bivens* action to proceed.

C

Boule also argues that his First Amendment retaliatory-investigation claim is cognizable under *Bivens*. I concur in the Court's judgment that it is not, but I arrive at that conclusion by following precedent rather than by applying the Court's new, single-step inquiry. *Ante*, at 7; see *infra*, at 15–17.

This Court has repeatedly assumed without deciding that *Bivens* extends to First Amendment claims, see *Wood* v. *Moss*, 572 U. S. 744, 757 (2014), but has never squarely held as much, see *Reichle* v. *Howards*, 566 U. S. 658, 663, n. 4 (2012). Accordingly, Boule's First Amendment retaliation presents a new context for the purpose of the *Bivens* analysis. See *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 24) (noting that a case can present a new context if it implicates a different constitutional right than those already recognized as cognizable under *Bivens*).

Moving to the second step of the *Bivens* inquiry, unlike Boule's Fourth Amendment claim, there is "reason to pause" before extending *Bivens* to Boule's First Amendment claim. *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7). In particular, his First Amendment claim raises line-drawing concerns similar to those this Court identified in *Wilkie*, 551 U. S. 537. In *Wilkie*, a landowner sought to bring a *Bivens* action against federal officials whom the landowner accused of harassment and intimidation meant to extract an easement across his property. 551 U. S., at 541. The Court observed that "defining a workable cause of action" for such a claim was "difficul[t]." *Id.*, at 555; see also *id.*, at 557. Recognizing a *Bivens* action to redress retaliation under such circumstances would, in the Court's view, "invite

claims in every sphere of legitimate governmental action affecting property interests" and "across this enormous swath of potential litigation would hover the difficulty of devising a . . . standard that could guide an employee's conduct and a judicial factfinder's conclusion." 551 U. S., at 561. Because of the "elusiveness of a limiting principle" for claims like the landowner's, *id.*, at 561, n. 11, the Court decided that courts were ill equipped to tailor an appropriate remedy, *id.*, at 562.

Boule's First Amendment retaliation claim raises similar concerns. Unlike the constitutional rights this Court has recognized as cognizable under *Bivens*, First Amendment retaliation claims could potentially be brought against many different federal officers, stretching substantially beyond the "common and recurrent sphere of law enforcement" to reach virtually all federal employees. *Ziglar*, 582 U. S., at ___ (slip op., at 11). Under such circumstances, this Court's precedent holds that "'evaluat[ing] the impact of a new species of litigation'" on the efficiency of civil service is a task for Congress, not the courts. *Wilkie*, 551 U. S., at 562; see also *Ziglar*, 582 U. S., at ___ (slip op., at 13). I therefore concur in the judgment as to the Court's reversal of the Court of Appeals' conclusion that Boule's First Amendment *Bivens* action may proceed, not for the reasons the Court identifies, *ante*, at 13–16, but because precedent requires it.

## III

If the legal standard the Court articulates to reject Boule's Fourth Amendment claim sounds unfamiliar, that is because it is. Just five years after circumscribing the standard for allowing *Bivens* claims to proceed, a restless and newly constituted Court sees fit to refashion the standard anew to foreclose remedies in yet more cases. The measures the Court takes to ensure Boule's claim is dismissed are inconsistent with governing precedent.

A

Two Terms ago, this Court reiterated and reaffirmed *Ziglar*'s two-step test for assessing whether a claim may be brought as a *Bivens* action. See *Hernández*, 589 U. S., at \_\_\_ (slip op., at 7) ("When asked to extend *Bivens*, we engage in a two-step inquiry"). Today, however, the Court pays lip service to the test set out in our precedents, but effectively replaces it with a new single-step inquiry designed to constrict *Bivens*. *Ante*, at 7 (acknowledging this Court's previous "two ste[p]" standard but insisting that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy"); *ante*, at 8 (positing that "[t]he newness of [some] 'new context[s]' should alone require dismissal" (some internal quotation marks omitted)). The Court goes so far as to announce that "[t]he *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action," *ante*, at 11; instead, courts must "only" decide "whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed,'" *ibid.* (quoting *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 12)).

That approach contrasts starkly with the standard the Court announced in *Ziglar* and applied in *Hernández*. This Court regularly has considered whether courts are "well suited . . . to consider and weigh the costs and benefits of allowing a damages action to proceed," *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 12), and have never held that such weighing is categorically impermissible, contrary to the Court's analysis today. See also *Wilkie*, 551 U. S., at 554 (noting that the *Bivens* inquiry asks courts to "weig[h] reasons for and against the creation of a new cause of action").

The Court justifies its innovations by selectively quoting our precedents and presenting its newly announced stand-

ard as if it were always the rule. The Court's repeated citation to *United States* v. *Stanley*, 483 U. S. 669 (1987), is just one example. The Court cites *Stanley* for, among other things, the proposition that the special-factors analysis must be conducted at a very broad level of generality. *Ante*, at 11. *Stanley*, however, cautioned against a case-specific special-factors analysis in the narrow context of "judicial intrusion upon military discipline." 483 U. S., at 681. As it had in previous cases seeking to raise *Bivens* actions in the military context, the *Stanley* Court emphasized the need to be "protective of military concerns," 483 U. S., at 681, and to avoid "call[ing] into question military discipline and decisionmaking," *id.*, at 682. The Court therefore determined that in the military sphere, the special-factors analysis should be applied somewhat more broadly than the respondent urged. *Id.*, at 681. *Stanley*, in other words, reflected the Court's longstanding approach to *Bivens* cases: considering the facts and the substantive context of each case and determining whether special factors counseled hesitation. *Stanley* did not purport to articulate a special-factors framework that should apply to all *Bivens* cases going forward.

The Court further declares that "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances'" with previous cases that have recognized a *Bivens* remedy. *Ante*, at 17. To the extent these statements suggest an exacting new-context inquiry, they are in serious tension with the Court's longstanding rule that trivial differences alone do not create a new *Bivens* context. See *Ziglar*, 582 U. S., at ___ (slip op., at 26); see also *ante*, at 2 (GORSUCH, J., concurring in judgment) ("Candidly, I struggle to see how this set of facts differs meaningfully from those in *Bivens* itself"). Indeed, until today, the Court has never so much as hinted that courts should refuse to permit a *Bivens* action in a case

involving facts substantially identical to those in *Bivens* itself. *Supra*, at 8–9.[3]

## B

The Court's application of its new standard to Boule's Fourth Amendment claim underscores just how novel that standard is. Even assuming the claim presents a new context, the Court's insistence that national-security concerns bar the claim directly contravenes *Ziglar*. Moreover, the Court's holding that a nonbinding administrative investigation process, internal to the agency and offering no meaningful protection of the constitutional interests at stake, constitutes an alternative remedy that forecloses *Bivens* relief blinks reality.

### 1

The Court acknowledges the force of the Court of Appeals' conclusion that *Bivens* and this case present "'almost parallel circumstances,'" but it nonetheless concludes that a most unlikely special factor counsels hesitation: the "national-security context." *Ante*, at 10. By the Court's telling, *Hernández* declined to recognize a *Bivens* action "because 'regulating the conduct of agents at the border unquestionably has national security implications,' and the 'risk of undermining border security provides reason to hesitate before extending *Bivens* into this field.'" *Ante*, at 9

———————

[3] The Court supports its decision not to recognize an action under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), by observing that we have declined to recognize a *Bivens*-style cause of action for other constitutional violations. *Ante*, at 1. What the Court fails to acknowledge, however, is that each of those cases presented a meaningfully new context and/or raised special factors counseling hesitation that are not present in this case. See *supra*, at 6, 9–10, 13–14, 15–16; *infra*, at 21–22. The one exception is *Hui* v. *Castaneda*, 559 U. S. 799, 808 (2010), in which the Court did not have to conduct this analysis because it held the FTCA's comprehensive remedial scheme, which provided both a cause of action and an exclusive damages remedy for the claim at issue, clearly precluded a *Bivens* claim.

(quoting *Hernández*, 589 U. S., at ___ (slip op., at 14)).  That reasoning, the Court concludes, "applies here with full force" because "national security is at issue."  *Ante*, at 9–10.

This is sheer hyperbole.  Most obviously, the Court's conclusion that this case, which involves a physical assault by a federal officer against a U. S. citizen on U. S. soil, raises "national security" concerns does exactly what this Court counseled against just four years ago.  Back then, the Court advised that "national-security concerns must not become a talisman to use to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'"  *Ziglar*, 582 U. S., at ___ (slip op., at 20) (quoting *Mitchell* v. *Forsyth*, 472 U. S. 511, 523 (1985)).  It explained that this "danger of abuse is even more heightened given the difficulty of defining the security interest in domestic cases."  *Ziglar*, 582 U. S., at ___ (slip op., at 20) (internal quotation marks omitted).  This case does not remotely implicate national security.  The Court may wish it were otherwise, but on the facts of this case, its effort to raise the specter of national security is mere sleight of hand.

Nor is there any indication that Congress acted to deny a *Bivens* remedy for a case like this, which otherwise might counsel hesitation.  See *Bush*, 462 U. S., at 368 (declining to "supplement" Congress' existing scheme "with a new judicial remedy").  Congress has not provided that federal law enforcement officers may enter private property near a border at any time or for any purpose.  Quite the contrary: Congress has determined that immigration officers may enter "private lands" within 25 miles of an international border without a warrant only "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States."  66 Stat. 233, 8 U. S. C. §1357(a)(3).  This allowance is itself subject to exceptions: Officers cannot enter a "dwellin[g]" for immigration enforcement purposes without a warrant.  *Ibid.*  Mere proximity to a border, in other words, did not give Agent Egbert greater license to enter

Boule's property. Nor does it diminish or call into question the remedies for constitutional violations that a plaintiff may pursue, particularly where, as here, an agent unquestionably was not acting "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Ibid.*

Remarkably, the Court goes beyond invoking its national-security talisman in this case alone. In keeping with the unprecedented level of generality the Court imports into the special-factors analysis, the Court holds that courts are not "competent to authorize a damages action . . . against Border Patrol agents generally." *Ante*, at 11. This extraordinary and gratuitous conclusion contradicts decades of precedent requiring a context-specific determination of whether a particular claim presents special factors counseling hesitation. See *supra*, at 6–8.[4]

The consequences of the Court's drive-by, categorical assertion will be severe. Absent intervention by Congress, CBP agents are now absolutely immunized from liability in any *Bivens* action for damages, no matter how egregious the misconduct or resultant injury. That will preclude redress under *Bivens* for injuries resulting from constitutional violations by CBP's nearly 20,000 Border Patrol agents, including those engaged in ordinary law enforcement activities, like traffic stops, far removed from the border. U. S. Customs and Border Protection, On a Typical Day in Fiscal Year 2021, CBP . . . (2022), https://www.cbp.gov/newsroom/stats/typical-day-fy2021. This is no hypothetical: Certain CBP agents exercise broad authority to make warrantless arrests and search vehicles up to 100 miles away from the border. See 8 U. S. C. §1357(a); 8 CFR

———————
[4] Any concerns that a case-specific *Bivens* inquiry in cases involving CBP or ICE agents would pose administrability problems is misplaced. See Brief for American Civil Liberties Union et al. as *Amici Curiae* 14–18 (citing lower court cases that have applied this approach to suits against CBP and ICE agents).

§287.1(a)(2) (2021).  The Court's choice to foreclose liability
for constitutional violations that occur in the course of such
activities, based on even the most tenuous and hypothetical
connection to the border (and thereby, to the "national-
security context"), betrays the context-specific nature of
*Bivens* and shrinks *Bivens* in the core Fourth Amendment
law enforcement sphere where it is needed most.   See
*Ziglar*, 582 U. S., at ___ (slip op., at 11).[5]

2

The Court further proclaims that Congress has provided
alternative remedies that "independently foreclose" a
*Bivens* action in this case.  *Ante*, at 12.  The administrative
remedy the Court perceives, however, is no remedy whatso-
ever.

The sole "remedy" the Court cites is an administrative
grievance procedure that does not provide Boule with any
relief.  The statute on which the Court relies provides: The
"Secretary of Homeland Security . . . shall have control, di-
rection, and supervision of all employees and of all the files
and records of [CBP]."  8 U. S. C. §1103(a)(2); see *ante*, at
12.  Administrative regulations direct CBP to investigate
alleged violations of its own standards by its own employ-
ees.  See 8 CFR §§287.10(a)–(b).[6]  The Court sees fit to defer

───────────

[5] To the extent the Court's decision may be motivated by fears that al-
lowing this *Bivens* action to proceed will open the floodgates to countless
claims in the future, cf. *ante*, at 15, that concern is overblown.  The doc-
trine of qualified immunity will continue to protect government officials
from liability for damages unless a plaintiff "'pleads facts showing (1)
that the official violated a statutory or constitutional right, and (2) that
the right was "clearly established" at the time of the challenged con-
duct.'"  *Wood* v. *Moss*, 572 U. S. 744, 757 (2014) (quoting *Ashcroft* v. *al-
Kidd*, 563 U. S. 731, 735 (2011)).

[6] The regulations require any investigative report regarding excessive
force to "be referred promptly for appropriate action in accordance with
the policies and procedures of the Department [of Homeland Security]."
8 CFR §287.10(c).  Those policies and procedures, in turn, explicitly es-
tablish no "right or benefit, substantive or procedural, enforceable at law

21

to this procedure, even while acknowledging that complainants in Boule's position have no right to participate in the proceedings or to seek judicial review of any determination. *Ante*, at 12. The Court supports its conclusion that CBP's internal administrative grievance procedure offers an adequate remedy by insisting that "we have never held that a *Bivens* alternative must afford rights to participation or appeal." *Ante*, at 13. In the Court's view, "[s]o long as Congress *or the Executive* has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Ibid.* (emphasis added).

This analysis drains the concept of "remedy" of all meaning. To be sure, the Court has previously deemed *Bivens* claims foreclosed by "substantive" remedies to claimants that are in significant part administrative. *Bush*, 462 U. S., at 385; see also, *e.g.*, *Schweiker*, 487 U. S., at 424–425. The Court also has recognized that existing remedies need not "provide complete relief for the plaintiff," *Bush*, 462 U. S., at 388, including loss due to emotional distress or mental anguish, or attorney's fees, *Schweiker*, 487 U. S., at 424–425. Until today, however, this Court has never held that a threadbare disciplinary review process, expressly conferring no substantive rights, "secure[s] adequate deterrence and afford[s] . . . an alternative remedy." *Ante*, at 14. Nor has it held that remedies providing no relief to the individual whose constitutional rights have been violated are "adequate" for the purpose of foreclosing a *Bivens* action. To the contrary, each of the alternative remedies the Court has recognized has afforded participatory rights, an opportunity for judicial review, and the potential to secure at least some meaningful relief. See, *e.g.*, *Minneci* v. *Pollard*, 565 U. S. 118, 127 (2012) (state tort law); *Ziglar*, 582 U. S.,

or in equity." Dept. of Homeland Security, Dept. Policy on the Use of Force, §X, Policy Statement 044–05 (Sept. 7, 2018).

at ___ (slip op., at 25) (petition for writ of habeas corpus or injunctive relief ); *Bush*, 462 U. S., at 385.[7]

The Court previously has emphasized that a *Bivens* action may be inappropriate where "Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." *Carlson*, 446 U. S., at 18–19 (emphasis deleted). Thus, our cases declining to extend *Bivens* have done so where Congress, sometimes in conjunction with the Executive Branch, provided "comprehensive" and meaningful remedies. *Bush*, 462 U. S., at 388; see also *Schweiker*, 487 U. S., at 414, 423, 428 (emphasizing that the "design" of the "elaborate remedial scheme" in the Social Security disability program "suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration"); *Malesko*, 534 U. S., at 72 (noting that remedies available to the plaintiff were "at least as great, and in many respects greater, than anything

———————

[7] Aside from CBP's internal grievance procedure, Agent Egbert contends that the FTCA offers an alternative remedy for claims like Boule's. This Court does not endorse this argument, and for good reason. This Court repeatedly has observed that the FTCA does not cover claims against Government employees for "violation[s] of the Constitution of the United States." 28 U. S. C. §2679(b)(2)(A); see *Wilkie* v. *Robbins*, 551 U. S. 537, 553 (2007); *Carlson* v. *Green*, 446 U. S. 14, 20 (1980) ("Congress views FTCA and *Bivens* as parallel, complementary causes of action"); *Correctional Services Corp.* v. *Malesko*, 534 U. S. 61, 68 (2001) (noting that it was "crystal clear" that "Congress intended the FTCA and *Bivens* to serve as parallel and complementary sources of liability" (internal quotation marks omitted)). Just two Terms ago, the Court reaffirmed that by carving out claims "'brought for . . . violation[s] of the Constitution'" from the FTCA's "'exclusive remedy for most claims against Government employees arising out of their official conduct,'" "Congress made clear that it was not attempting to abrogate *Bivens*" and instead "simply left *Bivens* where it found it," *Hernández* v. *Mesa*, 589 U. S. ___, ___–___, and n. 9 (2020) (slip op., at 16–17, and n. 9) (quoting *Hui*, 559 U. S., at 806; §2679(b)(2)(A)).

that could be had under *Bivens*”); *Minneci*, 565 U. S., at 120 (rejecting *Bivens* action for Eighth Amendment violations against employees of a privately operated federal prison because “state tort law authorizes adequate alternative damages actions—actions that provide both significant deterrence and compensation”).　By the Court’s logic, however, the existence of any disciplinary framework, even if crafted by the Executive Branch rather than Congress, and even if wholly nonparticipatory and lacking any judicial review, is sufficient to bar a court from recognizing a *Bivens* remedy. That reasoning, as disturbing as it is wrong, marks yet another erosion of *Bivens*’ deterrent function in the law enforcement sphere.[8]

C

The Court thinly veils its disapproval of *Bivens*, ending its opinion by citing a string of dissenting opinions and single-Member concurrences by various Members of this Court expressing criticisms of *Bivens*. *Ante*, at 16–17.　But the Court unmistakably stops short of overruling *Bivens* and its progeny, and appropriately so.　Even while declining to extend *Bivens* to new contexts, this Court has reaffirmed that it did “not inten[d] to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose.” *Ziglar*, 582 U. S., at \_\_\_ (slip op., at 11).　Although today’s opinion will make it harder for plaintiffs to bring a successful *Bivens* claim, even in the Fourth Amendment context, the lower courts should not read it to render *Bivens* a dead letter.

That said, the Court plainly modifies the *Bivens* standard in a manner that forecloses Boule’s claims and others like them that should be permitted under this Court’s *Bivens*

─────────

[8] Even beyond its doctrinal innovations on the merits, the Court also fashions a brand new, *Bivens*-specific procedural rule under which it excuses Egbert’s forfeiture of his argument that CBP’s administrative process suffices as an alternative remedy. *Ante*, at 12, n. 3.

precedents. That choice is in tension with the Court's insistence that "prescribing a cause of action is a job for Congress, not the courts." *Ante*, at 1; see *ante*, at 11 (cautioning against "frustrat[ing] Congress's policymaking role" when considering whether special factors counsel hesitation). Faithful adherence to this logic counsels maintaining *Bivens* in its current scope, but does not support changing the status quo to constrict *Bivens*, as the Court does today. Congress, after all, has recognized and relied on the *Bivens* cause of action in creating and amending other remedies, including the FTCA. By nevertheless repeatedly amending the legal standard that applies to *Bivens* claims and whittling down the number of claims that remain viable, the Court itself is making a policy choice for Congress. Whatever the merits of that choice, the Court's decision today is no exercise in judicial modesty.

*       *       *

This Court's precedents recognize that suits for damages play a critical role in deterring unconstitutional conduct by federal law enforcement officers and in ensuring that those whose constitutional rights have been violated receive meaningful redress. The Court's decision today ignores our repeated recognition of the importance of *Bivens* actions, particularly in the Fourth Amendment search-and-seizure context, and closes the door to *Bivens* suits by many who will suffer serious constitutional violations at the hands of federal agents. I respectfully dissent from the Court's treatment of Boule's Fourth Amendment claim.